UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
ALICIA MITCHELL FOXWORTH,                    :
                                             :
                    Plaintiff,               :    03 Civ. 3005 (MBM)
                                             :
       -against-                             :    OPINION AND ORDER
                                             :
AMERICAN BIBLE SOCIETY                        :
                                             :
                    Defendant.               :
-----------------------------------X

APPEARANCES

AMBROSE WOTORSON, ESQ.
(Attorney for Plaintiff)
26 Court Street, Suite 1811
Brooklyn, NY 11242
(718) 797-4861

LORI D. BAUER, ESQ.
PETER C. MOSKOWITZ, ESQ.
(Attorneys for Defendant)
Jackson Lewis LLP
59 Maiden Lane
New York, NY 10038-3898
(212) 545-4000

MICHAEL B. MUKASEY, U.S.D.J.

Plaintiff Alicia Mitchell Foxworth sues her former employer, defendant American Bible Society ("ABS"), alleging race discrimination, sex discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, -3 (2000) ("Title VII"); 42 U.S.C. § 1981 (2000); the New York State Human Rights Law, N.Y. Exec. Law § 296 (McKinney 2005); and the New York City Human Rights Law, N.Y. City Admin. Code § 8-107 (2004). ABS moves for summary judgment dismissing all of plaintiff's claims pursuant to Fed. R. Civ. P. 56. For the following reasons, defendant's motion for summary judgment is granted and plaintiff's complaint is dismissed.

I.

The following facts are either undisputed or presented in the light most favorable to plaintiff.[1] Plaintiff, an African-American female, was hired in July 2000 as a Brand Manager for the American Bible Society, a nonprofit organization that produces, markets, distributes, and sells a wide variety of

_____

[1] However, because plaintiff's Rule 56.1 statement is filled largely with repetitive, immaterial, and argumentative passages taken verbatim from her brief, most citations below to relevant facts in the record are to papers submitted by defendant. <u>See</u> S.D.N.Y. R. 56.1(b) ("The papers opposing a motion for summary judgment shall include . . . if necessary, additional paragraphs containing a <u>separate, short and concise</u> statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.") (emphasis added).

Bibles and Bible-related products.  (Def.'s R. 56.1 Statement ¶¶ 3, 23.)  Plaintiff's principal assignment was to market the Jubilee Bible, an ABS product targeted primarily to African-American consumers and designed in "a format accessible to the common person."  (Id. ¶¶ 16, 19, 23.)  The Jubilee Bible was developed by Charles Smith, a former ABS employee, in the early 1990s and was launched with a marketing budget of $500,000 for ABS's fiscal year 1999 (July 1999-June 2000).  (Id. ¶¶ 17, 32.) During that launch period, ABS employees Thomas Durakis, John Cruz, and William Giarratana handled marketing for the Jubilee Bible.  (Id. ¶ 20.)  Durakis and Cruz then hired plaintiff to take over as Brand Manager for the Jubilee Bible during fiscal year 2000-2001.  (Id. ¶ 23.)

Plaintiff was one of three Brand Managers at ABS. Karina Lucero, a Guatemalan female, was responsible for marketing children's and special products, which included the Kingsley's Meadow animated video series for pre-school children and the Contemporary English Version of the Bible.  (Id. ¶ 24.)  Ramon Molina, a Filipino male, was in charge of marketing the Learning Bible and the Good News Translation.  (Id. ¶ 25.)  All three were hired as part of a reorganization of the ABS Brand/Royalty unit initiated in mid-2000 by Thomas Durakis, then Director of Product Marketing, in order to create separate marketing budgets and Brand Manager positions for the Jubilee Bible, the Learning

Bible, and the Kingsley's Meadow video.  (Id. ¶ 21.)  However, the majority of ABS's remaining inventory, about 600 to 1000 Bible-related products, was sold exclusively through the ABS catalog and did not receive separate marketing budgets.  (Id. ¶¶ 13-14.)

As Brand Manager for the Jubilee Bible, plaintiff's first major task was to develop a marketing plan for the product. According to Durakis, plaintiff struggled with the assignment, never having produced a marketing plan at her previous job promoting securities products for British Telecom.  (Id. ¶¶ 35-36; see also Wotorson Aff. Ex. 7, Durakis Dep. 53 (stating that "I had to work with [plaintiff] extensively developing the marketing plan" because "she didn't know how to do a marketing plan").)  As a result, plaintiff did not receive final approval of her marketing plan until November 2000.  (See Def.'s R. 56.1 Statement ¶ 37.)

Plaintiff, by contrast, attributes these difficulties to her belief that Durakis and others at ABS "engaged in behavior that appeared designed to ensure my failure" (Wotorson Aff. Ex. 11, Foxworth Aff. ¶ 5 ("Pl.'s Aff.")), including, inter alia, withholding key approvals, funding, and personnel support for plaintiff's marketing initiatives; failing to attend marketing meetings and pursue leads with large potential distributors of the Jubilee Bible, including Time Warner; and, in the case of

Durakis, requiring "time consuming" stylistic changes to plaintiff's marketing plan that "did not contribute to the product's overall viability."  (Pl.'s Mem. Opp'n Summ. J. 5-6.) Plaintiff emphasizes in particular that the $200,000 allocated to marketing the Jubilee Bible for fiscal year 2000-2001 was "paltry" compared to the $500,000 marketing budget she believed was necessary (Pl.'s Aff. ¶ 4; Bauer Aff. Ex. B, Foxworth Dep. 53-55, 62 ("Pl.'s Dep.")), and in light of the $400,000 allocated to marketing the Kingsley's Meadow video during 2000-2001 and the $350,000 budget devoted to marketing the Learning Bible during its launch that fiscal year.  (See Def.'s R. 56.1 Statement ¶¶ 43-44.)

     In October 2000, plaintiff approached Patrick English, an ABS Executive Vice President, with her concerns, informing him that "her role was being undermined by a complete lack of support from management . . . . because of apparent ABS resistance to African-American markets, her presumed specialty."  (Pl.'s Mem. Opp'n Summ. J. 7.)  Although plaintiff did not state explicitly at the time that she believed she was being discriminated against based on her race or sex (id.; Bauer Aff. Ex. B, Pl.'s Dep. 48-49), she allegedly stated that "her role did not seem secure because it was tethered and intertwined with the African-American[] market," and that information was being withheld from her and her ideas were not being well received in the marketing

department. (Pl.'s Mem. Opp'n Summ. J. 7.) Plaintiff subsequently reiterated these concerns to English and other ABS employees while attending a dinner during an October 2000 Jubilee Bible event in Detroit, Michigan. (Def.'s R. 56.1 Statement ¶¶ 78-80.) It was at this dinner that plaintiff's colleagues told her about the alleged long-standing resistance of ABS management to marketing the Jubilee Bible to the African-American community. (Pl.'s Aff. ¶ 11.)

In January 2001, ABS engaged in a new round of reorganization in its marketing department, reclassifying the three Brand Manager positions held by plaintiff, Lucero, and Molina to Marketing Manager for their respective product lines. (Def.'s R. 56.1 Statement ¶¶ 51-52.) Plaintiff's new title, Marketing Manager for African-American Scholarly/Trade Products,[2] reflected a pick-up of marketing duties for six new publications and an expansion of her responsibilities to include promoting scholarly products that were expected to be produced under a marketing deal reached with the German Bible Society. (See id. ¶ 53-55; Pl.'s Aff. ¶ 18.) According to Durakis and Dino Battista, then Director of Brand Marketing and plaintiff's supervisor, this shift in plaintiff's duties was necessary because sales of the

---

[2] Although both parties use the same title to describe plaintiff's position in their briefs, an internal company memorandum suggests that the official title for plaintiff's position was Marketing Manager for Scholarly, Trade and Specialty Products. (See Wotorson Aff. Ex. 2.)

Jubilee Bible had declined 34% from $321,780 in fiscal year 1999-2000 to $211,128 in 2000-2001 and thus no longer justified a full-time marketing manager. (Def.'s R. 56.1 Statement ¶¶ 46-47, 53.)

Both sides agree that the Jubilee Bible's disappointing sales figures were traceable in part to the creation of a competing "Jubilee Legacy Bible" by Charles Smith, the initial Jubilee Bible creator, after his departure from ABS to join the National Baptist Convention. (Id. ¶ 59; Pl.'s Aff. ¶ 14.) Plaintiff, however, points also to the allegedly inadequate support by ABS management for the Jubilee Bible, as manifested by an insufficient marketing budget, the initially high price of the product, and the failure of Eugene Habecker, ABS President, to attend major marketing events for the Jubilee Bible in key cities such as Atlanta, Baltimore, Detroit, and New York. (See Pl.'s Mem. Opp'n Summ. J. 11-13.)

Faced with the continued decline in sales for the Jubilee Bible and an organization-wide downsizing at ABS, which included the laying off of 25 employees during plaintiff's tenure and a dramatic slashing of ABS's aggregate marketing budget from approximately $950,000 in fiscal year 2000-2001 to $100,000 in 2001-2002 (see Def.'s R. 56.1 Statement ¶¶ 57-58, 70), Battista proposed in May 2001 that plaintiff's position be eliminated and replaced with a subordinate Product Specialist position designed to support and report to the two remaining Marketing Managers.

(Id. ¶ 65.)  In a memorandum outlining the proposal, he
emphasized that "[b]ecause of the small number of titles
scheduled to be published by the Publishing Unit in [plaintiff's]
area, the workload does not justify a full Marketing Manager
position."  (Wotorson Aff. Ex. 2.)  Durakis and John Cruz, then
Vice President of Publishing, approved Battista's recommendation,
relying also for their decision on the need for budget cuts at
ABS, the relatively weak sales figures for the Jubilee Bible, and
ABS's "significant growth plans" for Lucero's and Molina's
brands, including the creation of a New International Version of
the Learning Bible, a relaunch of the Contemporary English
Version ("CEV") of the Bible, and the introduction of a CEV Youth
Bible for teens.[3]  (Def.'s R. 56.1 Statement ¶¶ 62-64, 68.)

     In May 2001, plaintiff was offered the Product
Specialist position, which entailed a $9000 salary cut and a
subordinate role, but she did not accept the position during the
ensuing month.[4]  (See id. ¶ 74; Pl.'s Aff. ¶¶ 19, 21.)  She

---

[3] Defendant's reliance on the "continued marketing of [the]
Kingsley's Meadow [video], which included a marketing deal with
Sony" is misleading.  (See Def.'s R. 56.1 Statement ¶ 64.)  By
the time plaintiff's position was reclassified in May 2001, ABS
already had terminated its relationship with Sony and commenced
litigation against its former partner.  (See Bauer Aff. Ex. J at
3.)

[4] Plaintiff's contention that a termination letter was
overnighted to her on June 20, 2001 before she had a chance to
accept the Product Specialist position is not supported by the
termination letter itself, which is dated July 11, 2001.  (See
Pl.'s Aff. ¶ 21; Bauer Aff. Ex. K.)

attempted instead unsuccessfully to find another position at ABS. (Def.'s R. 56.1 Statement ¶ 73.)  Plaintiff was sent a termination letter on July 11, 2001 and offered a severance package that would have required her to relinquish all legal claims against ABS.  (Bauer Aff. Ex. K.)  Plaintiff rejected the severance package and completed her year of service at ABS on July 20, 2001.  (Id. Exs. K, L.)

Within days of her departure, plaintiff sent a letter to the EEOC outlining several instances of alleged discrimination she suffered at ABS (Wotorson Aff. Ex. 3), following up with a formal EEOC charge of race and sex discrimination in January 2002 (Bauer Aff. Ex. M).  In that EEOC charge, plaintiff recounted the various obstacles that had hindered her marketing of the Jubilee Bible, noting that her efforts were "repeatedly met with opposition, withheld information, lies and an overall lack of cooperation," and alleging that her Marketing Manager position "was eliminated because of my ethnicity, which is African-American[,] and [my] gender."  (Bauer Aff. Ex. M.)  However, plaintiff did not allege specifically in her EEOC charge that she had made any complaints to ABS management about being discriminated against or that she had been subject to retaliatory acts, nor did she check the "retaliation" box on her EEOC complaint form, selecting only "race" and "gender" as the "cause of discrimination."  (See id.)  Nevertheless, plaintiff's second amended complaint filed before this court alleged race and sex

discrimination, as well as retaliation.  (Bauer Aff. Ex. A.)


                              II.

        ABS moves for summary judgment arguing, first, that
"Defendant's alleged conduct -- not supporting marketing efforts
targeting the African American marketplace and undermining
Plaintiff's efforts to market the Jubilee Bible -- is not covered
by the anti-discrimination statutes."  (Def.'s Mem. Supp. Summ.
J. 2.)

        Under Title VII, as well as related provisions of the
New York State and New York City Human Rights Laws, a claim of
discrimination is cognizable only when it challenges an "unlawful
employment practice" of the defendant employer.  42 U.S.C. §
2000e-2; see also N.Y. Exec. Law § 296 (defining an "unlawful
discriminatory practice" in terms materially similar to Title
VII); N.Y. City Admin. Code § 8-107 (same).  Courts have held
that an "unlawful employment practice" is limited to
discriminatory conduct directed at current or prospective
employees, and thus does not include bias directed at third
parties not in an employment relationship with the allegedly
offending employer.  For example, in Wimmer v. Suffolk County
Police Department, 176 F.3d 125 (2d Cir. 1999), the Second
Circuit upheld the dismissal of a Title VII claim where a police
officer alleged retaliation after he reported fellow officers for

"act[ing] in a discriminatory manner toward the public" by using racial slurs against black citizens. Id. at 134-35. The Court noted that the plaintiff had failed to present any evidence that the conduct of his co-employees had affected the "terms and conditions of employment" within the police department itself, and concluded that the plaintiff's "opposition was not directed at an unlawful employment practice of his employer," and thus was "not cognizable under Title VII." Id. at 135; see also Taneus v. Brookhaven Mem'l Hosp. Med. Ctr., 99 F. Supp. 2d 262, 267 (E.D.N.Y. 2000) (employee's complaints about hospital's treatment of patients not protected because "acts of discrimination against private individuals are simply not within the area of activity protected by Title VII"); Kunzler v. Canon, USA, Inc., 257 F. Supp. 2d 574, 582 (E.D.N.Y. 2003) (harassment directed toward a customer, rather than an employee, "would not constitute unlawful action by an employer").

In this case, plaintiff alleges that "my managers in the marketing area discriminated against the African-American marketplace and my efforts to market . . . the Jubilee Bible." (Bauer Aff. Ex. C, Pl.'s Dep. 58.) Wimmer and its progeny make clear, however, that an allegation of discriminatory conduct directed at third parties, whether a business's customers or members of the general public, does not state a cognizable claim of employment discrimination. Thus, to the extent that plaintiff's claims of discrimination arise out of alleged

10

discrimination against members of the "African-American marketplace," rather than against plaintiff herself, such claims may not be pursued under Title VII or related state and municipal anti-discrimination statutes.[5]

However, not all of plaintiff's claims are predicated on discrimination against African-American consumers in the marketing of the Jubilee Bible. Notwithstanding defendant's insistence to the contrary (Def.'s Mem. Supp. Summ. J. 14; Def.'s Reply Mem. 3-4), plaintiff does in fact allege that the "terms, conditions, and privileges" of her employment were altered based on her own race and sex. (Bauer Aff. Ex. 3, 2d Am. Compl. ¶¶ 1, 6; see also id. ¶ 6(f) (alleging that defendant "failed to adequately support plaintiff's marketing efforts, in part, because of plaintiff's race and gender, and because her focus was African-American consumers") (emphasis added); Bauer Aff. Ex. C, Pl.'s Dep. 58 ("[M]y managers in the marketing area discriminated against the African-American marketplace and my efforts to market . . . the Jubilee Bible.") (emphasis added).) In particular, plaintiff alleges that she was excluded frequently from key marketing meetings; that members of ABS management refused to

<hr>

[5] Plaintiff's claim under 42 U.S.C. § 1981, which safeguards the right "to make and enforce contracts . . . as is enjoyed by white citizens," must also be dismissed because plaintiff has failed to establish that ABS denied African-American consumers the opportunity to purchase the Jubilee Bible or somehow sold the product on discriminatory terms. (See Def.'s R. 56.1 Statement ¶ 46 (reporting Jubilee Bible sales of $532,908 over two years).)

provide her with the funds, personnel, and support needed to market the Jubilee Bible; that information was withheld from her; and that management refused to follow leads from major potential distribution channels of the Jubilee Bible, including Time Warner. (Pl.'s Mem. Opp'n Summ. J. 5-6.) This lack of support from ABS, plaintiff contends, translated into lower sales for the Jubilee Bible, which undermined plaintiff's role at ABS and led ultimately to the reclassification of her position and her subsequent dismissal. (See Pl.'s Aff. ¶ 7.) Such allegations, even if not credited ultimately as creating an issue of material fact as to whether plaintiff suffered discrimination, place plaintiff's claims within the ambit of Title VII.

In evaluating a race and sex discrimination claim under Title VII, courts apply the familiar three-part burden shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[6] Under the first prong of this analysis, plaintiff must establish a prima facie case of discrimination by showing that (i) she belonged to a protected class; (ii) she was qualified for the position; (iii) she suffered an adverse employment action; and (iv) the adverse

---

[6] This framework applies also to plaintiff's claims under the New York State and New York City Human Rights Laws. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000). Likewise, because plaintiff concedes that her claim of sex discrimination is based on the same facts underlying her race discrimination claim (Bauer Aff. Ex. C, Pl.'s Dep. 95), the same analysis and result below apply to that claim as well.

employment decision occurred under circumstances giving rise to an inference of discrimination. Collins v. N.Y. City Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002). If plaintiff establishes her prima facie case, the burden of production shifts to defendant to offer a legitimate, non-discriminatory rationale for its actions. James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000). If defendant meets this burden, plaintiff "must show circumstances that would be sufficient to permit a rational finder of fact to infer that [defendant's] employment decision was more likely than not based in whole or in part on discrimination." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks omitted).

For purposes of this motion, the court assumes that plaintiff has met her "minimal" burden of establishing a prima facie case of discrimination. See James, 233 F.3d at 153-54; Bluight v. Consol. Edison Co., No. 00 Civ. 3309, 2002 WL 188349, at *5 (S.D.N.Y. Feb. 6, 2002); Griffin v. Ambika Corp., 103 F. Supp. 2d 297, 307 (S.D.N.Y. 2000). In response, defendant has more than met its burden of presenting a legitimate, non-discriminatory reason for the adverse employment actions taken against plaintiff, particularly the reclassification of plaintiff's Marketing Manager position to Product Specialist and her subsequent dismissal. Specifically, defendant maintains that it reclassified plaintiff's position because of (i) an inadequate

workload and lack of published titles to justify keeping three full-time marketing managers;[7] (ii) the weak sales of the Jubilee Bible, which had generated revenues insufficient to cover the Jubilee Bible's marketing costs, let alone its production costs; (iii) an ABS decision to reallocate its limited marketing resources to promoting more successful projects being handled by Lucero and Molina; and (iv) an organization-wide downsizing at ABS, which included the laying off of 25 employees and a substantial reduction in ABS's aggregate marketing budget from $950,000 in fiscal year 2000-2001 to $100,000 in 2001-2002. (Def.'s Mem. Supp. Summ. J. 18-19, 21-22.) Each of these explanations, individually and together, is sufficient to rebut plaintiff's prima facie case of discrimination. Lanier v. I.B.M. Corp., 319 F. Supp. 2d 374, 383 (S.D.N.Y. 2004) (employer's "budgetary justification" for elimination of plaintiff's position and decision to "allocate finite resources" to other programs satisfied employer's burden); Murphy v. Graphic Controls Corp., 98 Civ. 0533, 2000 WL 1375738, at *6 (W.D.N.Y. Sept. 21, 2000) (defendant's reliance on "financial business necessities" and "declining company sales and revenue" as basis for elimination of

---

[7] For example, plaintiff was responsible for marketing only six titles at the time of the reclassification, whereas Lucero and Molina were responsible for marketing 19 and 22 titles, respectively. (Def.'s R. 56.1 Statement ¶ 67.) In addition, the new scholarly products that ABS expected to be developed by the German Bible Society and marketed by plaintiff ultimately did not materialize. (Id. ¶ 61.)

plaintiff's position provided a "legitimate and reasonable explanation for its actions").

Once an employer has met its burden of presenting a legitimate, non-discriminatory reason for its actions, "the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination."  <u>James</u>, 233 F.3d at 154. At this third and final stage of the <u>McDonnell Douglas</u> analysis, "[e]vidence casting doubt on the employer's proffered justification 'may -- or may not -- be sufficient'" to show discrimination, <u>Bluight</u> v. <u>Consol. Edison Co.</u>, 2002 WL 188349, at *3 (quoting <u>Fisher</u> v. <u>Vassar College</u>, 114 F.3d 1332, 1333 (2d Cir. 1997) (en banc)), and thus it is the court's responsibility to "examin[e] the entire record to determine whether the plaintiff could satisfy [her] ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."  <u>Id.</u> (first alteration in original) (internal quotation marks omitted) (quoting <u>Schnabel</u> v. <u>Abramson</u>, 232 F.3d 83, 90 (2d Cir. 2000)); <u>see also</u> <u>Lanier</u>, 319 F. Supp. 2d at 383 ("Plaintiff must show (1) that the Defendant's proffered reason is false and (2) discrimination was the real reason.").

To demonstrate pretext, plaintiff argues that defendant's budgetary explanations for its reclassification of plaintiff's position -- namely, that it was engaging in organization-wide downsizing but had "significant growth plans"

15

for products assigned to the two other Marketing Managers --
"strains credulity" because it is "physically impossible" for a
business "to contract and to expand at the same time." (Pl.'s
Mem. Opp'n Summ. J. 26-27.) Contrary to plaintiff's odd
assertion, however, an employer's decision to reallocate its
limited resources from less successful to more successful
projects reflects not a "physical" phenomena but a financial
reality: Businesses routinely make decisions about the
appropriate allocation, or reallocation, of their resources,
expanding some enterprises while reducing others, and such
business judgments do not invariably provide evidence of
discriminatory intent. See Lanier, 319 F. Supp. 2d at 383-84
(multi-million dollar budgetary reduction in programs handled by
plaintiff and shifting of "finite resources" to other programs
not discriminatory); Pisana v. Merrill Lynch & Co., 93 Civ. 4541,
1995 WL 438715, at *9 (S.D.N.Y. July 24, 1995) (defendant's
hiring of 51 employees, including four managers, for a new group
to work on specially funded projects not evidence that reduction
in force leading to plaintiff's dismissal was pretextual).

Indeed, in this case, ABS devoted approximately
$700,000 over two years to marketing the Jubilee Bible, $500,000
of which was spent during the Jubilee Bible's launch in 1999-
2000. (Def.'s R. 56.1 Statement ¶¶ 32, 40.) Not only was the
Jubilee Bible one of only a handful of ABS products that received
separate budgetary and personnel support for its marketing (id. ¶

15), but also in its inaugural year, the Jubilee Bible's marketing budget was $150,000 more than the budget for the Learning Bible during its product launch a year later (id. ¶ 43). At any rate, it is simply not for this court to determine whether the ABS budget for the Jubilee Bible was "enough" relative to other ABS projects.  As the Second Circuit has noted, the anti-discrimination statutes do not grant the federal courts a "roving commission to review business judgments," see Montana v. First Fed. Sav. & Loan Ass'n, 869 F.2d 100, 106 (2d Cir. 1989) (internal quotation marks omitted), and therefore courts "must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process" absent independent evidence of discrimination.  See Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985); see also Fitzpatrick v. N.Y. Cornell Hosp., 00 Civ. 8594, 2003 WL 102853, at *6 (S.D.N.Y Jan. 9, 2003) ("The laws prohibiting discrimination in employment were not intended to transform the courts into personnel managers.") (internal quotation marks omitted).  ABS may not have implemented what plaintiff regards as an effective marketing plan for the Jubilee Bible, but ABS's business judgment, wise or unwise, cannot serve in itself as the basis of plaintiff's discrimination claim.[8]  See Fitzpatrick, 2003 WL 102853, at *7 ("[C]ourts are

_____

[8] Likewise, ABS's decision not to pursue a copyright infringement claim against the National Baptist Convention for creating a competing "Jubilee Legacy Bible" and ABS's expenditure of $600,000 on the website forministry.com, a reference tool for

17

not to interfere with the employer's business judgment so long as
that judgment is not exercised for discriminatory reasons."); _Pisana_, 1995 WL 438715, at *4 (holding that an employer "is not
obliged to prove the wisdom of its business judgments, so long as
those judgments were not tainted by discrimination" and that "in
the absence of any independent evidence of discriminatory taint
. . . [an employee's] self-evaluation is not relevant").

Even on the merits, plaintiff's claim that ABS
deliberately set out to sabotage the Jubilee Bible must be
rejected because it is economically implausible. In _Matsushita Electric Industrial Co._ v. _Zenith Radio Corporation_, 475 U.S. 574
(1986), the Supreme Court held that "if the factual context
renders [the non-moving party's] claim implausible -- if the
claim is one that simply makes no economic sense -- [the non-
moving party] must come forward with more persuasive evidence to
support [its] claim than would otherwise be necessary." _Id._ at
587; _see also_ _R.B. Ventures, Ltd._ v. _Shane_, 112 F.3d 54, 58 (2d
Cir. 1997) (emphasizing that _Matsushita_ does not impose a
"heightened" burden on the non-moving party but rather
"reinforces the notion, central to summary judgment
jurisprudence, that '[w]here the record taken as a whole could
not lead a rational trier of fact to find for the non-moving

religious organizations, does not demonstrate that plaintiff
suffered discrimination. (_See_ Def.'s Reply Mem. 16-17.)

18

party, there is no genuine issue for trial'") (alteration in original) (quoting <u>Matsushita</u>, 475 U.S. at 587).  In <u>Matsushita</u>, the Supreme Court rejected the plaintiffs' claim of a predatory pricing conspiracy by the defendants, concluding that the allegation was "speculative" and "ma[de] no practical sense" because "as presumably rational businesses, [defendants] had every incentive <u>not</u> to engage in the conduct with which they are charged, for its likely effect would be to generate losses for [defendants] with no corresponding gains."  <u>Matsushita</u>, 475 U.S. at 588, 590, 595, 597.

Likewise, in the instant case, plaintiff's claim that ABS actively sought to undermine one of its own products, even though it is in the business of selling and distributing Bibles and Bible-related products, "simply makes no economic sense." <u>See</u> <u>Matsushita</u>, 475 U.S. at 587; <u>see also</u> <u>Grossman</u> v. <u>Citrus Assocs. of N.Y. Cotton Exch., Inc.</u>, 706 F. Supp. 221, 234 (S.D.N.Y. 1989) (dismissing claim against weather forecasting service as economically implausible because "[i]t is contrary to [defendant's] economic and long-term business interests to intentionally issue false and misleading weather forecasts"). This is particularly the case here, where the alleged lead discriminator at ABS, Thomas Durakis, not only hired plaintiff (Def.'s R. 56.1 Statement ¶ 23), but also was responsible for marketing the Jubilee Bible in its inaugural year (<u>id.</u> ¶ 20) and,

as plaintiff emphasizes (Pl.'s Mem. Opp'n Summ. J. 3-4, 9 n.4),

defended the Jubilee Bible against efforts to give it a

scholarly, as opposed to a popular, tone and took active steps to

ensure that the product would appeal to the widest audience

possible (see Wotorson Aff. Ex. 7, Durakis Dep. 16-21). Cf.

Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997)

("[W]hen the person who made the decision to fire was the same

person who made the decision to hire, it is difficult to impute

to her an invidious motivation that would be inconsistent with

the decision to hire.").

In addition, beyond the legal conclusions offered in

her complaint, plaintiff has provided no admissible evidence that

ABS engaged in actionable discrimination based on plaintiff's

race or sex, rather than nonactionable discrimination against the

African-American marketplace.  For example, in her affidavit

opposing summary judgment, plaintiff alleges that "I was treated

differently, in comparison to similarly-situated managers."

(Pl.'s Aff. ¶ 9.)  However, not only is plaintiff's claim lacking

in specific details of the disparate treatment she allegedly

suffered, but it is also flatly contradicted by plaintiff's

deposition testimony in which she unambiguously conceded she had

little to no knowledge of how Lucero or Molina was treated by ABS

management.[9]  (See Pl.'s Dep. 21, 65, 77, 139-42; see also Brown

v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual

allegations that might otherwise defeat a motion for summary

judgment will not be permitted to do so when they are made for

the first time in the plaintiff's affidavit opposing summary

judgment and that affidavit contradicts her own prior deposition

testimony."); Griffin v. Ambika Corp., 103 F. Supp. 2d 297, 309

(S.D.N.Y. 2000) ("Without any frame of reference for comparison,

let alone any corroborating or verifying evidence of disparately

treated incidents, such an amorphous claim cannot stand on the

basis of mere conclusory allegations that plaintiffs were treated

differently.").)

Likewise, the affidavits of Suena Williams and Elaine

Nole, two former ABS employees, do not lend support to

plaintiff's claims of discrimination because neither had any

direct knowledge of the decision to reclassify plaintiff's

position and neither has plausibly linked ABS's alleged

resistance to marketing the Jubilee Bible to plaintiff's race or

sex.  (See Wotorson Aff. Ex. 10, Williams Aff. ¶ 5 (asserting

that ABS undermined the Jubilee Bible "because the project's

focus was on African-American consumers"); id. Ex. 9, Nole Aff.

_____

[9] Plaintiff's single concrete example of disparate treatment
-- that she was asked to present sales information for the
Jubilee Bible in a manner different from the way Lucero presented
her data, shows the relative weakness of plaintiff's claim.
(See Bauer Aff. Ex. C, Pl.'s Dep. 141-42.)

¶¶ 3, 12 (reporting hearsay complaints of "other managers/
colleagues" at ABS and concluding that ABS "lacked a sincere
commitment to the Jubilee Bible").)

Plaintiff's deposition testimony, moreover, is based
largely on her own conclusory assertions, subjective beliefs, and
circular reasoning.  For example, when asked about Durakis's
alleged failure to pursue a relationship with Time Warner to
distribute the Jubilee Bible -- the most specific example she
provided of an "ignored" lead -- and how that failure constituted
racial discrimination, the following exchange occurred:

> Q: Why do you think ignoring a lead is discrimination
> based on race?
> A: I believe ignoring the leads was discrimination <u>in
> the African-American marketplace</u>.
> Q: Why?
> A: "Why"?
> Q: Why?
> A: Because if you're not supporting that effort, then
> you're undermining it.
> Q: How are you undermining it?
> A: By not supporting it.

(Bauer Aff. Ex. C, Pl.'s Dep. 64-65 (emphasis added).)  Courts
have held consistently that "[s]tatements that are devoid of any
specifics, but replete with conclusions, are insufficient to
defeat a properly supported motion for summary judgment."
<u>Bickerstaff</u> v. <u>Vassar College</u>, 196 F.3d 435, 452 (2d Cir. 1999);
<u>Augliaro</u> v. <u>Brooks Bros., Inc.</u>, 927 F. Supp. 741, 748 (S.D.N.Y.
1996) ("[I]t [i]s incumbent upon plaintiff to present 'specific
facts' -- not conclusory allegations, speculations, surmise, or

'feelings' -- to show the existence of genuine issues for trial.").  Although plaintiff does provide a few additional examples of information that was withheld from her or leads that were not followed (Bauer Aff. Ex. C, Pl.'s Dep. 70, 72-74, 82, 85-86, 88), a thorough review of the depositions, exhibits, and papers submitted by the parties demonstrates that such allegations are not linked in any significant way to plaintiff's race or sex.  See Taylor v. Polygram Records, No. 94 Civ. 7689, 1999 WL 124456, at *16 (S.D.N.Y. Mar. 8, 1999) (plaintiff's "belief, based on no evidence other than gut instinct, that [her supervisor] treated her with hostility because of her race, cannot justifiably support an inference of discrimination" when nothing in the record supported that linkage); Padob v. Entex Info. Serv., 960 F. Supp. 806, 812 (S.D.N.Y. 1997) ("Plaintiff has not linked [her] differential treatment to her gender in any way other than to point to the fact that she was the only female Corporate Sales Manager.").

In other words, plaintiff's claims, with respect to both the terms and conditions of her employment as well as her eventual dismissal, appear to be based more on plaintiff's subjective disenchantment with ABS's alleged lack of commitment to the Jubilee Bible, rather than discrimination because of plaintiff's race or sex.  See Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000); Coraggio v. Time Inc. Magazine Co., 94 Civ.

23

5429, 1996 WL 139786, at *5 (S.D.N.Y. Mar. 28, 1996).

Accordingly, plaintiff has failed to establish an issue of

material fact as to whether ABS intentionally discriminated

against her.


III.

Plaintiff's claim of retaliation also must be dismissed

because she failed to exhaust her administrative remedies.  As a

precondition to filing a Title VII claim in federal court, a

plaintiff must exhaust available administrative remedies and file

a timely complaint with the EEOC.  Deravin v. Kerik, 335 F.3d

195, 200 (2d Cir. 2003).  Claims not asserted before the EEOC may

be pursued directly in federal court only if they are "reasonably

related" to claims already filed with the agency.  Butts v. City

of New York Dep't of Housing Pres. & Dev., 990 F.2d 1397, 1401

(2d Cir. 1993) (noting that "[t]his exhaustion requirement is an

essential element of Title VII's statutory scheme" and is

designed "to encourage settlement of discrimination disputes

through conciliation and voluntary compliance") (internal

quotation marks omitted).  An uncharged claim is "reasonably

related" to conduct alleged in an EEOC complaint where (i) the

claim would fall within the reasonable scope of the EEOC

investigation; (ii) the employee alleges retaliation by an

employer for filing an EEOC charge; or (iii) the plaintiff

alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.  Id. at 1402-03.

Only the first category of "reasonably related" claims is relevant to this case.  See Cordoba v. Beau Dietl & Assocs., 02 Civ. 4951, 2003 WL 22902266, at *10 (S.D.N.Y. Dec. 8, 2003); Melendez v. Int'l Serv. Sys., Inc., 97 Civ. 8051, 1999 WL 187071, at *8 (S.D.N.Y. Apr. 6, 1999).  As the Second Circuit has explained, this category is

> essentially an allowance of loose pleading.
> Recognizing that EEOC charges frequently are filled out
> by employees without the benefit of counsel and that
> their primary purpose is to alert the EEOC to the
> discrimination that a plaintiff claims she is
> suffering, we have allowed claims not raised in the
> charge to be brought in a civil action where the
> conduct complained of would fall within the scope of
> the EEOC investigation which can reasonably be expected
> to grow out of the charge of discrimination.

Butts, 990 F.2d at 1402 (internal quotation marks omitted).  A claim not included in an EEOC charge will not be deemed "reasonably related" where the claim is based on "a wholly different type of discrimination" from that alleged in the EEOC complaint, or "[w]here the facts in the original EEOC charge do not sufficiently apprise the EEOC that another type of discrimination claim lurks in the background."  Alonzo v. Chase Manhattan Bank, N.A., 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998) (internal quotation marks omitted).  In conducting this analysis, however, the court must look beyond "the four corners of the

25

often inarticulately framed charge" and assess the factual allegations underlying the plaintiff's claims, keeping in mind that "it is the substance of the charge and not its label that controls." See Bailey v. Colgate-Palmolive Co., 99 Civ. 3228, 2003 WL 21108325, at *13 (S.D.N.Y. May 14, 2003) (internal quotation marks omitted).

In this case, plaintiff checked "race" and "gender" as the causes of discrimination in her EEOC charge, leaving the "retaliation" box unmarked. (Bauer Aff. Ex. M.) Although this fact alone is not dispositive, any fair reading of plaintiff's narrative description of her claims attached to her EEOC charge indicates that plaintiff's claims are "bereft of any factual allegation from which one could infer that plaintiff is asserting retaliation." Bailey, 2003 WL 21108325, at *13 (internal quotations marks omitted). In that attachment, plaintiff provided specific examples of how her efforts to market the Jubilee Bible "were repeatedly met with opposition, withheld information, lies and an overall lack of cooperation," expressly stating her belief that "my position was eliminated because of my ethnicity, which is African-American[,] and [my] gender." (Bauer Aff. Ex. M.)

However, plaintiff made no allegation in her EEOC complaint that she had engaged in any kind of "protected activity" that was met by a retaliatory response from her

employer.  See Wimmer v. Suffolk County Police Dep't, 176 F.3d
125, 134 (2d Cir. 1999) ("To establish a prima facie case of
retaliation, an employee must show [1] participation in a
protected activity known to the defendant; [2] an employment
action disadvantaging the plaintiff; and [3] a causal connection
between the protected activity and the adverse employment
action.") (alterations in original) (internal quotation marks
omitted).  Indeed, unlike plaintiff's deposition testimony and
her affidavit opposing summary judgment, plaintiff's EEOC charge
provides no indication that she complained to ABS Executive Vice
President Patrick English about her treatment in the ABS
marketing department (see Pl.'s Aff. ¶¶ 8-9), that English then
conveyed plaintiff's concerns to ABS President Eugene Habecker
and other members of ABS management (id. ¶¶ 10, 12), or that
plaintiff reiterated her complaints to English and other
colleagues at a dinner during an October 2001 Jubilee Bible event
in Detroit (id. ¶ 11).[10]  Nor does plaintiff's EEOC charge
discuss whether and to what extent she lodged complaints of

_____

[10] Although plaintiff did include a paragraph describing the
Detroit dinner in her 11-page letter to the EEOC in July 2001
(Wotorson Aff. Ex. 3 at 4), that letter was not incorporated into
plaintiff's January 2002 EEOC charge and apparently was not sent
to her employer.  See Sussle v. Sirina Prot. Sys. Corp., 269 F.
Supp. 2d 285, 315 (S.D.N.Y. 2003) (questionnaire submitted by
plaintiff to EEOC "does not extend the scope of his EEOC Charge"
because "[o]nly the charge is sent to the employer, and therefore
only the charge can affect the process of conciliation")
(internal quotation marks omitted).

either discrimination or poor treatment with her supervisors in the ABS marketing department, including Dino Battista, Thomas Durakis, or John Cruz.  (See id. ¶¶ 12-13; see also Cordoba, 2003 WL 22902266, at *10 ("Indeed, the EEOC Complaint does not contain a single reference to [plaintiff's] complaints to [her supervisor and another employee].  This omission is critical because [plaintiff's] complaints are the predicate of the retaliation claims set forth in her amended complaint.").

As the District Court stated in Chinn v. City University of New York School of Law, 963 F. Supp. 218 (E.D.N.Y. 1997), "[t]he 'reasonable relatedness' test is not satisfied by the improbable possibility that the EEOC could have stumbled into a new universe of allegations that the plaintiff alleges for the first time in [her] complaint." Id. at 223-24.  That plaintiff alleged race and sex discrimination in her EEOC charge is not enough to have provided the EEOC, or her employer, with notice of a claim of retaliatory motive.  Gambrell v. Nat'l R.R. Passenger Corp., No. 01 Civ. 6433, 2003 WL 282182, at *8 (S.D.N.Y. Feb. 3, 2003) ("Where the EEOC charge alleges discrimination but not retaliation, the reasonable scope of the agency's investigation cannot be expected to encompass allegations of retaliatory motive."); Melendez v. Int'l Serv. Sys., Inc., 97 Civ. 8051, 1999 WL 187071, at *7 (S.D.N.Y. Apr. 6, 1999) (dismissing uncharged retaliation claim as "based on a 'wholly different' type of

discrimination that would not reasonably fall within the scope of the EEOC investigation"); <u>Chinn</u>, 963 F. Supp. at 223 (holding that plaintiff's racial discrimination claim was "separate and distinct" from his retaliation claim "[e]ven under a broad, liberal reading of [plaintiff's] EEOC charge"). Accordingly, plaintiff's retaliation claim must be dismissed for failure to exhaust administrative remedies.

In addition, even if plaintiff exhausted her administrative remedies, and even if plaintiff could establish a prima facie case of retaliation, as with her underlying claim of racial discrimination, plaintiff has not presented evidence sufficient to rebut ABS's legitimate, non-discriminatory reasons for her dismissal -- namely the disappointing sales figures for the Jubilee Bible, the lack of titles being published in plaintiff's area, the need for organization-wide budget cuts, and the desire of ABS management to shift limited marketing resources to more successful projects. (<u>See</u> Def.'s Mem. Supp. Summ. J. 18-19, 21-22.)

\*                    \*                    \*

For the reasons stated above, defendant's motion for summary judgment is granted and plaintiff's complaint is dismissed.

SO ORDERED:

Dated:    New York, New York
          July 28, 2005

Michael B. Mukasey
U.S. District Judge